## EMPIRE PIPE LINE CO. v. SPEARS.

### No. 25730.   June 11, 1935.

James L. Dolman and H. J. Patterson, for plaintiff in error.

J. B. Moore, for defendant in error.

WELCH, J. Plaintiff sued the defendant for alleged service rendered and performed under the terms of an oral contract. The suit was originally filed in the justice of the peace court, where plaintiff obtained judgment for $75, and was appealed by the defendant to the district court, where, upon trial to a jury, plaintiff was given judgment in the sum of $73.75 in accordance with the verdict of the jury. The defendant appeals.

The controversy grew out of an alleged contract of employment in a telephone conversation between the plaintiff and one of defendant's agents on the 4th of April, 1932, wherein plaintiff alleged that the defendant employed him to represent it in obtaining a refund of taxes formerly paid by the defendant in Carter county.

The essential facts are: The defendant was entitled to a refund of taxes theretofore paid in Carter county, amounting to $295.01, by virtue of a legal determination sustaining certain tax protests. The final date upon which this refund might be claimed under the law expired April 6, 1932. Plaintiff, as a part of his occupation or business, interested himself in checking the public records of Carter county with reference to tax refund matters. It appears that he was familiar with the records and status of persons who had or had not collected their tax refunds in connection with the particular tax protest involved, and he solicited representation from persons whom he thought might be interested in employing him in connection therewith.

At about 11 a. m. of April 4, 1932, he called by long distance telephone from Ardmore to Bartlesville, Okla. The call was placed to the defendant, and upon learning that the head of the tax department was not in the office, he talked with one Collins, who was connected with the defendant's tax department. We quote plaintiff's testimony with reference to this telephone conversation as follows:

"A. Yes, he is in their office, and when I first talked to him I told him I wanted to talk to him about some tax matters. He said, 'Spears, what are you trying to do, are you trying to make us pay more taxes?' I assumed that he thought I was a tax ferret. I said, 'Wait a minute, I am not trying to make you pay more taxes, but what I am talking about is for you to get some of the taxes that you have paid back.' He said, 'Fine, what is your proposition?' I told him that I had represented a number of taxpayers in these matters and that the custom was a fifty-fifty basis. He said, 'Fine, all right, what is it on?' I said, 'On your property in Carter county, here in Carter county.' He said, 'What is it?' I said, 'It is a rebate on your property here in Carter county,' and I told him about the time about to be up, and he said, 'That is fine.' So he said, 'Now I tell you what you had better do, you had better write Jack Lennox, the head tax man,' the man that I had known for a long time. I said, 'Where is he?' He said, 'He is in New Mexico.' I said, 'When will he be back,' and he said, 'In a week or ten days,' and I said, 'That will be too late, it won't do any good.' He said, 'Why so?' I told him then that the time would be up day after tomorrow, after five o'clock. He said 'Let's see Spears, I will tell you what I will do, I will wire you in a little while, I will have to talk to the treasurer about it.' I had done given him the information and I had done thought we had made the trade when he was telling me it was fine on a fifty-fifty basis, and he talked as though it was. I had dealt with hundreds of other taxpayers before that and in their talking to me I had no trouble.

He said, 'I will wire you in a little while, or call you again,' and I give him my home number, and I stayed there all day waiting for a call or a wire, and I didn't get it. So I figured out that perhaps he had decided that he could collect it himself then after I had given him the information. Next morning I was in the county clerk's office where you have to get your claim made out, and Mr. Collins came in and I talked to him some."

Plaintiff heard nothing further from the defendant or any of its agents until the following morning when he saw Mr. Collins at Ardmore, in the county clerk's office. Upon inquiry Mr. Collins informed him that he did not need his assistance in procuring the tax rebate. Collins filed claim for the tax rebate and procured the same in the name of the defendant corporation. Collins offered plaintiff his personal check in the sum of $10, suggesting that would likely pay him for his trouble and expense in connection with the telephone call. The check was refused by plaintiff. It appears from the testimony that the check was not offered as an act of the defendant corporation, but was offered as a personal matter between Collins and the plaintiff, with the suggestion that when he, Collins, could see his superiors he would take up with them the matter of a fee for plaintiff. Plaintiff heard nothing further for several weeks, after which he communicated with the head of defendant's tax department by letter, resulting in no adjustment of the matter. These communications appear to have little bearing on the issues as made here, the plaintiff relying upon the telephone conversation hereinabove set out as constituting a contract between the parties.

Mr. Collins' testimony regarding the telephone conversation and the circumstances surrounding same is as follows:

"A. Mr. Spears inquired for Mr. Lennox, the head tax man. I told him Mr. Lennox was out of the city and as I recall I told him I believed he was out in New Mexico. I said he had some tax matters out there. When Mr. Spears learned Mr. Lennox was not in the office he asked me how long he would be gone and I said, 'Probably a week or ten days.' He said, 'I would like to represent you on some tax matters down here in Carter county.' I said, 'What is it all about, John?' I had known John some three or four years, having contact with him in my work. He was very secretive, and naturally I was secretive. We have calls, any number of calls, every month from various individuals wanting to represent us for this, that or the other thing,

and the first thing that popped into my mind was that possibly that John was acting as a tax ferret. I told him we had paid all of our taxes in Carter county and then it was that he told me that we had some money coming back to us. I knew that, but I didn't see it was any of my business to tell him that I knew it, and he said he wanted to represent us to get this money back. I said, 'What is your proposition?' I was just stalling along and he was stalling me. Each of us was holding the other fellow off at arm's length. He said, 'I usually get 50 per cent., that is the customary charge.' I said, 'Well, John, you know I haven't any authority to authorize anybody to represent us, or make any agreement of any kind. I have to take this up with the treasurer, or with our management, and to see whether they want to employ you to represent us in any matter and I will have to take it up with them. If they decide to employ you, I will wire or phone you. I took it up with them and they said, 'Do you know what it is?' And I said, 'I have one refund that I have got in mind.' He was perfectly honest in regard to what he said that the refund would have to be collected on the 6th, it would have to be during the six month period. I didn't know but what possibly he might have had some other case in mind. As I said, I had had this particular refund in mind but due to the fact that our properties are considerably scattered I can't run out for one individual matter, I have got to take care of as many as possible on each trip, and I had another matter coming up in Pottawatomie county that I couldn't get to before the following day and I had in mind taking care of both of them at the same time. I so advised the management on that. They said, 'If you have got this particular refund in mind, and are going down there any way you can see him and see if there is anything else coming up.' Q. Did you find anything else coming up except this $295 refund in connection with the Empire Pipe Line Company? A. I did not. Q. Did you ever send him a wire? A. No, sir."

There was no further evidence as to any contract of employment. The defendant contends the evidence is wholly insufficient to establish any contract of employment, and that the trial court erred in refusing to instruct a verdict for defendant.

We have thoroughly checked the record. The most favorable interpretation which may be given plaintiff's own testimony fails to disclose any contract or agreement to employ plaintiff to obtain the tax refund for defendant. The plaintiff sought such employment and desired it, and intended or hoped to obtain the agreement to furnish his services for a percentage of the tax re-

546

fund of defendant. But the testimony in nowise indicates an intention to so contract upon the part of the defendant. The agreement or acquiescence of both parties is necessary to create a contract. The parties must have a distinct intention common to both and understand alike. 13 C. J. 263. There must be a meeting of the minds upon an offer and an acceptance. There was here the offer by plaintiff, but no acceptance by defendant, hence no contract.

In National Surety Co. v. Board of Education, City of Hugo, 36 Okla. 569, 129 P. 25, we held that the party who alleges a contract, either as a cause of action or a defense, has the burden of proving it, if the existence of the contract is put in issue; and he has the burden of proving every fact essential to the cause of action or defense. The rule applies to implied as well as express contracts.

Plaintiff failed to make the necessary proof to sustain his cause of action. The trial court erred in refusing to instruct a verdict in favor of the defendant.

The judgment is reversed.

McNEILL, C. J., and RILEY, PHELPS, and GIBSON, JJ., concur.